UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,                                      Case No. 3:20-cr-147

vs.

DARRELL LAMARUSE PLUMP,         District Judge Michael J. Newman

    Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 21)**

Defendant Darrell Lamaruse Plump is charged in a four-count indictment with being a felon in possession of a firearm, possession of a firearm in furtherance of a drug trafficking crime, and two additional drug-related crimes. Doc. No. 14. This case is before the Court upon Defendant's motion to suppress (doc. no. 21), the record and evidence admitted during a hearing on Defendant's motion (doc. no. 25), and the parties' post-hearing memoranda (doc. nos. 26, 27).

### I.     Background

During the suppression hearing, Dayton Police Officer Michael Schwartz testified that on the afternoon of November 11, 2020, he was patrolling alone in a marked police cruiser on Germantown Street in West Dayton. He was in a residential neighborhood with a reputedly high crime rate involving a "large amount of gun violence and narcotics crime." Doc. No. 25 at PageID 69. During his patrol, Officer Schwartz saw a black Volkswagen Passat "equipped with excessively dark window tint obstructing [his] ability to see any driver or passengers inside the vehicle." *Id*.

Officer Schwartz performed a U-turn and began following the Passat. *Id*. at 70. He then

saw the Passat pull to the curb without signaling. *Id*. Officer Schwartz drove past the vehicle, performed another U-turn, and positioned his cruiser so it was nose-to-nose with the Passat. *Id*. at 70-71. He activated the cruiser's overhead emergency lights, "signa[ling] a stop to the driver." *Id*. at 71. By this time, the driver (Defendant) had already exited the Passat and was walking near the sidewalk of 971 Haller Avenue. *Id*. Officer Schwartz testified, "I made contact with him. I introduced myself, and I informed him of the reason for stop." *Id*.

Defendant became "visibly upset." *Id*. His level of cooperation with Officer Schwartz was "minimal." *Id*. Two other Dayton police officers soon arrived at the scene. *Id*. Officer Schwartz testified, "I noticed a strong odor of marijuana about his [Defendant's] person. I escorted him -- or attempted to escort him toward our police cruiser. He grew increasingly upset upon contact, and it required another officer to assist me in escorting him." *Id*. After Officer Schwartz patted down Defendant and found no weapon on him, the officers placed Defendant in the backseat of Schwartz's cruiser without handcuffing him. *Id*. at 71, 85. Schwartz decided to prolong Defendant's stop "based on the strong odor of marijuana about his person." *Id*. at 86.

Defendant identified himself and gave his Social Security number to Officer Schwartz. *Id*. at 74. Using this information to search LEADS (the Law Enforcement Automated Data System), Officer Schwartz soon learned that Defendant had a valid driver's license and was on parole under the supervision of the Ohio Adult Parole Authority due to a previous felony conviction. *Id*. at 74-75, 103, 105. Officer Schwartz returned to the Passat "to see if there was any contraband in plain view due to the extent of marijuana that we had detected." *Id*. at 75. Although it was difficult for him to see through the "dark window tinting," *id*., he "noticed a burnt marijuana blunt in the cup holder of the vehicle." *Id*. at 75. He also "noticed a black handgun that was wedged between the passenger seat and the center console of the vehicle." *Id*. Officer Schwartz testified that because

2

of the dark tinted windows, he needed to approach to within inches of a window and shield his eyes from the sunlight in order to be able to see what was inside the Passat. *Id*. at 91. Officer Schwartz thought it likely that Defendant's parole status prohibited him from possessing a firearm. *Id*. at 76.

Officer Schwartz next contacted Detective Dustin Phillips of the Dayton Police Department. *Id*. Detective Phillips quickly arrived on the scene. *Id*.

During the suppression hearing, Detective Phillips testified that Officer Schwartz informed him about the firearm inside the Passat. *Id*. at 102-03. Detective Phillips confirmed this fact by looking into the Passat and seeing the firearm. *Id*. at 103, 126. He then searched a computer website and learned that Defendant's parole officer was Vivian Charles Washington. *Id*. at 103. Detective Phillips phoned Washington and told him about the events involving Defendant. *Id*. Washington decided to go to the scene. He arrived there between 15 and 25 minutes later. *Id*. at 104.

After learning more about the situation, Washington looked through the window of the Passat and saw the firearm. *Id*. at 106. Washington then placed Defendant under arrest for a parole violation. *Id*. Meanwhile, two or three other parole officer arrived at the scene. *Id*. at 125. Parole officers unlocked the Passat with keys that Defendant had dropped on the floor of the police cruiser. *Id*. at 104, 106, 121-22. The officers then searched the vehicle without a warrant and found a baggie of marijuana in the middle console, a loaded Glock .9 millimeter handgun (the firearm they had seen from outside the vehicle), and $2,975.00 in cash in the glove box. *Id*. at 107. Officer Schwartz did not participate in the search. Detective Phillips testified that Defendant was transported to jail and booked on a parole violation. *Id*. at 110.

Detective Phillips and the parole officers remained with the Passat, waiting for a tow truck.

While they waited, a woman arrived in a car. *Id*. at 111. Detective Phillips testified, "As she exited the car and began approaching… this house, 971 Haller Avenue, she was already yelling or speaking loudly from at least one house away, if not farther, stating -- pointing at the house she was still approaching and saying, you can't go in my son's house." *Id*. at 112. She was pointing at the house at 971 Haller Avenue. *Id*. Defendant, however, had not given the parole officers this address as his primary residence. *Id*. at 113, 129.

At this point, the parole officers continued to talk with the woman, and Detective Phillips stood by, scanning the surrounding area. *Id*. at 113. He soon noticed a black Cadillac sports utility vehicle parked on the street directly in front of 971 Haller Avenue. *Id*. at 113-14. He radioed for information and learned that the Cadillac was registered in Defendant's name. *Id*. at 113. When Detective Phillips told parole officers that the Cadillac was registered in Defendant's name, the parole officers "took it upon themselves to conduct a second … warrantless search of this vehicle, being that it belonged to [Defendant]," according to Detective Phillips. *Id*. at 114. The parole officers' search of the Cadillac discovered a bank statement containing Defendant's name and his address at 971 Haller Avenue. *Id*. at 114-15.

Parole officers next turned their attention to the house at 971 Haller Avenue. They contacted a supervisor with the Ohio Adult Parole Authority who authorized them to search the house without a warrant. *Id*. at 115-16, 124. Next, parole officers determined that the house was locked and contacted the arresting officers, who returned the keys that Defendant had dropped on the floor of the police cruiser. *Id*. at 117-18. Parole officers soon discovered that one of these keys unlocked the front door of the house. *Id*. at 117.

Detective Phillips explained, during the suppression hearing, "It was a parole search, however, since they had limited manpower, they requested additional, either detectives or officers,

from myself to assist with entering the house safely, just to see if people were inside." *Id*. at 118. Items found during the search of the house at 971 Haller Avenue included a box of .9 millimeter ammunition; "a digital scale with a large amount of methamphetamine residue on it"; two bags of suspected drugs; a large hydraulic press in the basement; a large extended magazine for a Glock .9 millimeter handgun on top of a nightstand next to a bed; a Glock firearm storage box with the make, model, and serial number of the gun it came with[1]; and 8 to 10 credit cards, debit cards, and insurance identification cards in Defendant's name. *Id*. at 118-19.

## II. The Fourth Amendment

The Fourth Amendment forbids "unreasonable searches and seizures" and provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. art. IV. "'It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions.'" *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560-61 (6th Cir. 2018) (cleaned up).

A defendant may assert a violation of the Fourth Amendment and seek suppression of evidence by filing a pretrial motion. *See* Fed. R. Crim. P. 12(b)(3)(C). The burden is on the defendant to show "a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n. 11 (6th Cir. 1979)).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures

---

[1] Detective Phillips noted that a Glock firearm storage box comes with the purchase of a Glock handgun. *Id*. at 119. The make and model on the storage box -- but not the serial number -- matched the Glock .9 millimeter handgun previously found in the Passat. *Id*.

that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

### III.     Analysis

**A.     The Stop**

Defendant first contends the traffic stop performed by Officer Schwartz on November 11, 2020 violated the Fourth Amendment. Doc. No. 26 at PageID 137. The Government argues that probable cause supported the stop because Officer Schwartz observed two violations of Ohio traffic law: (1) the Passat had excessively tinted windows in violation of Ohio Rev. Code § 4513.24; and (2) Defendant pulled the Passat to the curb without signaling, in violation of Ohio Rev. Code § 4511.29. Doc. No. 27 at PageID 147, 154.

A police officer may stop the driver of a vehicle without violating the Fourth Amendment when the officer has probable cause to believe that a driver has violated a traffic law. *Whren v. United States*, 517 U.S. 806, 810-12 (1996). In the context of an ongoing traffic violation, such as "overly tinted windows," courts apply the less stringent "reasonable suspicion" standard. *United States v. Shelton*, 817 F. App'x 217, 219 (6th Cir. 2020) (citing *Whren*, 517 U.S. at 810-812); *see also United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008). An officer reasonably suspects a window tint violation when he/she is familiar with the state's window tint law and "estimate[s] that the vehicle [is] substantially darker than permitted by law." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (affirming denial of motion to suppress); *see also Shelton*, 817 F. App'x at 219 (same). "Ohio law requires that tinting on certain windows allow at least 50 percent of the light to pass through." *United States v. Ross*, 847 F. App'x 316, 318 (6th Cir. 2021) (citing Ohio Rev. Code § 4513.241; Ohio Admin. Code § 4501-41-03(A)(3)).

6

Officer Schwartz's testimony during the suppression hearing establishes he has approximately seven years of experience as a Dayton police officer and, at the time of Defendant's arrest, he was familiar with Ohio's window tint law. Doc No. 27 at PageID 66, 70. When Officer Schwartz first saw the Passat, he noticed "the excessively dark window tint obstruct[ed] [his] ability to see any driver or passengers inside the vehicle." *Id*. at 69. He estimated, based on his previous experience, that the window tint blocked all but 10 to 20 percent of the light passing through the Passat's windows, and this was "[f]ar below any state standard." *Id*. at PageID 90. He further testified, "I had to approach the window within inches and even use my hands to shield the sunlight because of the dark tint." *Id*. at 91. For these reasons, Officer Schwartz had reasonable suspicion to conclude that the Passat's window tint exceeded 50 percent in violation of Ohio's window tint law. *Shank*, 543 F.3d at 313; *Ross*, 847 F. App'x at 318. Consequently, Officer Schwartz's traffic stop of the Passat did not violate the Fourth Amendment.

Defendant argues that doubt exists over two facts the Government relies on to support the traffic stop: (1) the Passat was a rental vehicle; and (2) Officer Schwartz did not use a tint meter to measure the amount of the vehicle's window tint. Doc. No. 26 at PageID 137-38. Accepting these fact as true, however, fails to negate Officer Schwartz's seven years of experience as a Dayton police officer; his familiarity with Ohio's window tint law; or the details he provided in support of his estimate about the amount of window tint – he testified, for example, that he needed to approach within inches of the window and needed to shield his eyes from the sun because of the dark tint in order to see into the Passat. Doc. No. 27 at PageID 91. Defendant also does not cite a case holding that reasonable suspicion of a window tint violation under Ohio law must be established with a tint meter measurement. *Cf. Shank*, 543 F.3d at 313 (reasonable suspicion found without use of a tint meter).

7

Officer Schwartz also saw the Passat pull to the curb without signaling. This observed violation of Ohio traffic law provided Officer Schwartz with probable cause to stop the Passat.[2] *See Ross*, 847 F. App'x at 319 (violation of Ohio's turn signal law supported traffic stop); *Whren*, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred").

Defendant analogizes the present case with *State v. Dorsey*, No. 2011-Ohio-962, 2011 WL 766662, at *3 (Ohio App. March 4, 2011) to show there is some doubt as to whether a driver's failure to signal before pulling to the curb violates Ohio traffic law. Doc. No. 26 at PageID 137. *Dorsey*, however, is both factually and legally distinguished from the present case. In *Dorsey*, the Ohio Court of Appeals recognized that to show a violation of a particular municipal ordinance, "it must be established that there was actual traffic approaching from the rear of the vehicle that pulled away from the curb without signaling." *Id*. The present case is not factually analogous to *Dorsey* because Officer Schwartz observed the Passat driven by Defendant pull to the curb - -not away from the curb -- without signaling. The present case is not legally analogous to *Dorsey* because the Ohio statute at issue here required Defendant to signal his "'intention to turn or move right or left … continuously during not less than the last one hundred feet traveled by the vehicle ... before turning.'" *Ross*, 847 F. App'x at 319 (quoting Ohio Rev. Code § 4511.39(A)). In contrast, the ordinance at issue in *Dorsey*, 2011 WL 766662, at *3, concerned the requirements for signaling when pulling away from a curb.

Additionally, having observed the above traffic law violations, and smelling the odor of marijuana around Defendant, the officers' acts of escorting and placing Defendant in the cruiser

---

[2] "Ohio law provides: 'When required, a signal of intention to turn or move right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle ... before turning.'" *Ross*, 847 F. App'x at 319 (quoting Ohio Rev. Code § 4511.39(A)).

8

without handcuffing him did not violate the Fourth Amendment. *See United States v. Bradshaw*, 102 F.3d 204, 211-12 (6th Cir. 1996) ("Detention in a police car does not automatically constitute an arrest"); *United States v. Faulkner*, 133 F. App'x 298, 302 (6th Cir. 2005) ("A defendant's 'nervous' and 'agitated' behavior, while not significant enough to warrant detention exceeding the scope of the original stop…, can justify detention in a police cruiser for a duration not exceeding the bounds of the initial stop." (internal citation omitted)).

In sum, Officer Schwartz's stop of Defendant and initial detention of him in a police cruiser did not violate the Fourth Amendment.

**B.      Prolonging The Stop**

Officer Schwartz testified during the suppression hearing that he decided to prolong Defendant's stop "based on the strong odor of marijuana about his person." Doc. No. 25 at PageID at 86.

Defendant contends that the evidence seized during the warrantless searches of the Volkswagen Passat, the black Cadillac SUV, and the house at 971 Haller Avenue must be suppressed as fruit of the poisonous tree -- the metaphorical poison being the prolonged wrongful detention of Defendant in violation of the Fourth Amendment. Doc. No. 26 at PageID 140-42. Defendant argues that Officer Schwartz should have written a window tint citation and then immediately released him. *Id*. at 136-39. He further maintains that the aroma of marijuana surrounding him fails to justify a continuation of the stop, and/or Officer Schwartz's peek into the Passat, because medical marijuana use is legal in Ohio and a personal level of marijuana use has been decriminalized in both the State of Ohio and the City of Dayton. *Id*. at PageID 138.

A traffic stop may violate the Fourth Amendment if it continues too long. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (citations omitted). "Like a *Terry* stop, the tolerable

9

duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id*. at 354 (analogizing *Terry v. Ohio,* 392 U.S. 1 (1968) (other citations omitted)). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355 (cleaned up) (quoting *Illinois v. Caballes,* 543 U.S. 405, 408 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." *Id*. at 354.

> "A seizure can be extended" for reasons outside the initial scope of the traffic stop "if something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."

*United States v. Howard*, 815 F. App'x 69, 76 (6th Cir. 2020) (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (other citations omitted)); *see United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008).

When the officers first placed Defendant in Officer Schwartz's cruiser, Officer Schwartz had not yet written a window tint citation or searched LEADS to determine if Defendant had any outstanding warrants. *Id*. at 92. He therefore had not completed the ordinary tasks tied to traffic stops. *Rodriguez*, 575 U.S. at 355. When Officer Schwartz searched LEADS, he learned that Defendant was on parole. This fact, combined with the odor of marijuana around Defendant, provided Officer Schwartz with reasonable and articulable suspicion to expand the traffic stop into an investigation into whether Defendant had violated the conditions of his parole. Indeed, "[t]he

10

odor of marijuana then gave the officer grounds for further detention….." *United States v. Simpson*, 520 F.3d 531, 534 (6th Cir. 2008). Given the reasonable and articulable suspicion that supported prolonging Defendant's stop into an investigation of a possible parole violation, it is simply irrelevant that that the State of Ohio and the City of Dayton have decriminalized personal marijuana use in some circumstances.

The decisions by Officers Schwartz and Phillips, and parole officer Washington, to look through the Passat's window for contraband -- without first obtaining a search warrant -- was a reasonable investigatory step to take in light of the marijuana odor around Defendant and his active parole status. *Cf. Simpson*, 520 F.3d at 534; *United States v. Zuniga*, 613 F. App'x 501, 507 (6th Cir. 2015) ("an officer can extend a stop where 'something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot'" (quoting *United States v. Winters,* 782 F.3d 289, 297 (6th Cir. 2015) (other citation omitted)). Moreover, this look through the vehicle window before it was unlocked did not require a search warrant. "'[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Campbell,* 549 F.3d 364, 373 (6th Cir. 2008)); *United States v. Weatherspoon,* 82 F.3d 697, 699 (6th Cir. 1996); *United States v. Harper*, 488 F. App'x 63, 67 (6th Cir. 2012).

Next, did the parole officers need a search warrant to unlock, enter, and search the Passat? No. The automobile exception to the search warrant requirement "allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Galaviz*, 645 F.3d at 355 (quoting *United States v. Smith,* 510 F.3d 641, 647 (6th Cir. 2007)). In this case, the information known to the parole officers included the aroma of

11

marijuana Officer Schwartz detected around Defendant and the gun in plain view inside the Passat. *Supra*, §II. This information gave parole officers probable cause to enter and search the Passat, without a warrant, and to seize items related to possible parole violations -- the handgun, ammunition, $2,975.00 in cash, and a baggie of what appeared to be marijuana. *See Galaviz*, 645 F.3d at 357 (gun in plain view created probable cause to search vehicle without warrant to determine if the driver violated Michigan law).

In sum, prolonging Defendant's stop did not violate the Fourth Amendment.

**C.    Defendant's Parole Conditions**

The Government asserts that the parole officers' three warrantless searches -- of the Passat, Cadillac, and house at 971 Haller Avenue -- were expressly authorized by the consent provisions of the Ohio Adult Parole Authority Conditions of Supervision concerning Defendant. Doc. No. 27 at PageID 155.

The Ohio Adult Parole Authority Conditions of Supervision signed by Defendant in February 2019 includes the following consent provision:

> I agree to the warrantless search of my person, motor vehicle, place of residence, personal property, or property that I have been given permission to use, by my supervising officer or other authorized personnel of the Ohio Department of Rehabilitation and Correction at any time.

Doc. No. 25, Exhibit 5. By signing this document, Defendant acknowledged that he fully understood the conditions of his supervision. *See id*.

Defendant does not address the significance of this document or the Government's contention that it establishes his consent to search the Passat, Cadillac, and house. *See* Doc. Nos. 21, 26. Defendant likewise does not challenge the voluntariness of his agreement to the conditions of his parole set forth in this document. *See id*. Consequently, Defendant's consent to the searches of his vehicles, property, and residence authorized his parole officers to search the Passat, the

12

Cadillac, and house consistent with the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is … well settled that one of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent").

In the alternative and setting aside Defendant's consent, there remains another basis for concluding that the searches of the Passat, Cadillac, and house did not violate the Fourth Amendment: the Fourth Amendment's "warrant and probable cause requirements generally do not apply to searches of parolees, probationers or their residences." *United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008) (citing *Samson v. California,* 547 U.S. 843, 857 (2006); *United States v. Knights,* 534 U.S. 112, 118, 121 (2001)).  One rationale is that "a State has an 'overwhelming interest' in supervising parolees because 'parolees ... are more likely to commit future criminal offenses.'" .  Another rationale is that "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson,* 547 U.S. at 853.  Consequently, a search of a parolee does not violate the Fourth Amendment when performed "pursuant to a constitutional state law authorizing the warrantless searches of parolees and their residences." *United States v. Sweeney*, 891 F.3d 232, 235-36 (6th Cir. 2018) (citing *Samson*, 547 U.S. at 856).  Ohio has such a statute, Ohio Rev. Code § 2967.131(C), and it is constitutional. *Id*. (citing *United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003)).

This Ohio statute allows officers to search, without a warrant, a parolee's person, residence, and motor vehicle when the officers have "reasonable grounds to believe …" that the parolee "is not abiding by the law, or otherwise is not complying with the terms and conditions …" of his parole.  Ohio Rev. Code § 2967.131(C).  Additionally, "[t]he Supreme Court has … held that,

13

under the totality-of-the-circumstances approach, officers generally need only 'reasonable suspicion' to search a probationer's home." *United States v. Lee*, 793 F.3d 680, 686 (6th Cir. 2015) (discussing *Knights,* 534 U.S. at 121). "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person ... of criminal activity.'" *Id*. (citing *United States v. Payne,* 181 F.3d 781, 788 (6th Cir. 1999)).

In the present case, as explained above, the parole officers had probable cause and, hence, reasonable suspicion to search the Passat. *Supra*, § III(B); *see Loney*, 331 F.3d at 521 ("the reasonable suspicion standard is less stringent than the probable cause requirement"). The parole officers had reasonable suspicion to search the Cadillac based in part on what they learned about the odor of marijuana around Defendant, the gun in the Passat (a parole violation), the baggie of marijuana in the Passat (another parole violation), and Defendant's mother's freely disclosed statement that the house at 971 Haller Avenue was his residence. The parole officers also knew that Defendant had not informed them that 971 Haller Avenue was his residence; instead, he gave them a different address of residence. Doc. No. 25 at PageID 113, 128-29. Based on the totality of this information, once parole officers learned from Detective Phillips that the Cadillac parked on the street directly in front of 971 Haller Avenue was registered in Defendant's name, they had reasonable suspicion to search the Cadillac to determine if Defendant was engaged in criminal activity, such as possession of narcotics or another additional firearms, or had committed an additional parole violation. The search of the Cadillac verified that Defendant resided at 971 Haller Avenue because officers discovered a bank statement in his name with his address as 971 Haller Avenue. This search also confirmed the information provided by Defendant's mother -- *i.e.*, that 971 Haller Avenue was Defendant's residence -- and was consistent with the fact that Defendant

14

parked the Passat near this address and one of the keys taken from Defendant unlocked the front door of the house at 971 Haller Avenue. Considering the totality of these circumstances, the officers had reasonable suspicion to search the house at 971 Haller Avenue for evidence that Defendant was engaged in criminal activity or violating the conditions of his parole. *See Lee*, 793 F.3d at 686 ("Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring articulable reasons and a particularized and objective basis for suspecting the particular person ... of criminal activity." (citations and internal punctuation omitted)).

Defendant also contends that the warrantless search of the house at 971 Haller Avenue violated his rights under the Fourth Amendment because no exigent circumstances supported the search. Doc. No. 26 at PageID 141. However, Defendant does not cite a case holding that, in addition to a parolee's valid consent to a warrantless search as a parole condition, exigent circumstances must support the warrantless search of a parolee's home. Additionally, neither of the two cases Defendant cites involved warrantless searches of a *state parolee's* home or vehicle; instead, each case applied the principle that "'an arrest warrant based upon probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" *United States. v. Jett*, No. 4:09CR297, 2009 WL 4043350, at *4 (N.D. Ohio Nov. 20, 2009) (quoting *Payton v. New York,* 445 U.S. 573, 603 (1980)); *United States v. Hardin*, 539 F.3d 404, 411 (6th Cir. 2008).

Defendant further contends that the police officers impermissibly used the parole officers in lieu of obtaining a search warrant for the Passat. Doc. No. 26 at PageID 141. Defendant points to Detective Phillips' testimony that he waited for the parole officer to arrive to "'make things a little bit cleaner.'" Doc. No. 26 at PageID 140 (citations omitted). Defendant also points to the following question and answer:

15

> [Defendant's attorney]. And you indicated that knowing that Mr. Plump was on parole, you reached out to the parole officer, and the parole officer if -- could do searches where you couldn't do a particular search without a warrant; is that right?
>
> [Detective Phillips]. Yes.

*Id.* (quoting PageID 121). Defendant does not explain the significance of this passage, *see id*. at 140-41, but he analogizes to cases in which police allegedly attempted to evade the Fourth Amendment's search warrant requirements by using private citizens to search suspect's homes or property. *See id*. The two cases Defendant cites are not factually similar to the present case because those cases involved private citizens rather than police or parole officers. *See Hardin*, 539 F.3d at 417-18 (apartment manager); *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985) (nanny). Here, Detective Phillips' decision -- to contact parole officers and wait for them to search the vehicles and the 971 Haller Avenue residence -- did not enlist a private party in an attempt to avoid the Fourth Amendment's warrant requirements.

In sum, the warrantless searches of the Passat, Cadillac, and 971 Haller Avenue address did not violate the Fourth Amendment.

### IV.  Conclusion

For all of the above reasons, Defendant's motion to suppress (doc. no. 21) is **DENIED**.

**IT IS SO ORDERED.**

August 9, 2021                                                                                  s/Michael J. Newman
                                                                                                              Hon. Michael J. Newman
                                                                                                              United States District Judge